FILED BY _____ D.C.

JAN 0 7 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

# UNITED STATES DISTRICT COURT
## for the
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

JACK STONE, MIYUKI SUZUKI,
M.S. (Minor child)

      Plaintiffs,

Case No.

Jury Trial: ☐ Yes ☑ No

vs.

PETER EDWARD GERMANN, ELIZABETH
HELEN GERMANN, MICHAEL SCOTT
STONE, TERESA GEORGILAKIS, ANGELO
GEORGILAKIS, SHERRY STONE

      Defendants,

_____/

## COMPLAINT FOR CIVIL CAUSE BREACH OF CONTRACT

### ADDITIONAL CAUSES INCLUDE ASSAULT, BATTERY, BREACH OF IMPLIED CONTRACT, CONVERSION, DEFAMATION PER SE, DETRIMENTAL RELIANCE, FRAUDULENT MISREPRESENTATION, FRAUD IN THE PERFORMANCE, QUANTUM MERUIT, TORTIOUS INTERFERENCE, UNJUST ENRICHMENT, MALICIOUS PROSECUTION AND ABUSE OF PROCESS

## I.
## PARTIES TO THE COMPLAINT

A.    **Plaintiffs**

Jack Stone
Maison Sato 101, 2-2-15 Tsunogoro
Aoba, Sendai, Japan, 980-0874
Telephone: 81 070.6951.2337
Email: stack.jones@mail.com

Miyuki Suzuki
Maison Sato 101, 2-2-15 Tsunogoro
Aoba, Sendai, Japan, 980-0874

**B.**     **Defendants**

Peter Edward Germann
1002 Dewitt Street
Sebring, FL 33872

Elizabeth Helen Germann
1002 Dewitt Street
Sebring, FL 33872

Michael Scott Stone
4456 Madeira Avenue
Sebring, FL 33872
Telephone: 863.471.2147
Email: captjacks@hotmail.com

Sherry Stone
127 Sharon Avenue
Sebring, FL 33875
Telephone: 863.451.6990
Email: sherryts1@hotmail.com

Angelo Georgilakis
14250 Nieves Circle
Winter Garden, FL 34787
Telephone: 407.209.6890
Email: teri5g@hotmail.com

Teresa Georgilakis
14250 Nieves Circle
Winter Garden, FL 34787
Telephone: 407.209.6890
Email: teri5g@hotmail.com

**II.**
**BASIS FOR JURISDICTION**

**A.**     **Jurisdiction**

Jurisdiction is proper under 28 U.S. Code § 1332(a), "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds $75,000."

Diversity action is proper under 28 U.S. Code § 1332(a)(3), which applies to "citizens of different States and in which citizens or subjects of a foreign state are additional parties."

Jurisdiction is proper under 28 U.S. Code §§ 1332(a) and (a)(3) because:

1.  Plaintiffs reside in Sendai, Japan.
2.  Defendants reside in Highlands County, Florida.

**B.**    **Venue**

Venue is proper at the Fort Pierce, U.S. District Court, Southern District of Florida, because Defendant Peter Edward Germann (Germann), Defendant Elizabeth Helen Germann (Ms. Germann), (collectively Germanns), Defendant Michael Scott Stone (Stone) and Defendant Sherry Stone, are domiciled in Highlands County, Florida, and were domiciled in Highlands County at the time they committed tortious acts against the Plaintiffs.

Defendants Angelo Georgilakis (Mr. Georgilakis) and Teresa Georgilakis (Georgilakis) claim to be residents of Highlands County, evinced on the face of a "ladybird" deed title transferred to Angelo Georgilakis by the Germanns, regarding real property the Germanns owned in Miami-Dade County, property relevant to Plaintiffs' causes of actions, notably, breach of contract, breach of implied contract, detrimental reliance, fraudulent misrepresentation, fraud in the performance, quantum meruit, tortious interference and unjust enrichment. Further, the transfer of the title to the Germanns' property was done for no other purpose but for the Germanns to try and avoid liability.

This Court also has personal jurisdiction over Defendants, and venue is proper, because December 10th 2019, Miami-Dade County Court Judge Carroll Kelly Ordered Plaintiffs had a Civil Cause of Action regarding personal and business property misappropriated by Defendants.

Further, July 2nd 2020 and August 3rd 2020, Miami-Dade County Court Judge Michaelle Gonzalez-Paulson Ordered the return of Plaintiffs' property, and set a return date deadline Defendants failed to comply with.

Venue is also proper because Defendant Sherry Stone misappropriated and converted to her own use more than $11,000.00 in personal and business property owned by Plaintiffs. The wrongful conduct of Sherry Stone occurred in Highlands County, and results in ongoing business losses and business opportunities, with additional losses exceeding $8000.00.

**C.**    **Plaintiffs' Causes of Action**

Plaintiffs exhausted all reasonable means to resolve the underlying matter without court intervention, and, at all times prior to filing this suit, acted in good faith to avoid litigation.

The U.S. District Court, Southern District of Florida recognizes the torts of assault, battery, breach of implied contract, conversion, defamation per se, detrimental reliance, fraudulent misrepresentation, fraud in the performance, quantum meruit, tortious interference with advantageous business relationship, unjust enrichment and abuse of process as actionable, thereby providing civil remedies in both law and equity.

Florida State Courts recognize the torts of assault, battery, breach of implied contract, conversion, defamation per se, detrimental reliance, fraudulent misrepresentation, fraud in the performance, quantum meruit, tortious interference with advantageous business relationship, unjust enrichment, malicious prosecution and abuse of process as actionable, thereby providing civil remedies in both law and equity.

Of all territories within the United States, Florida Courts are the most ardent proponents for civil causes of action for defamation per se and malicious prosecution. As such, Plaintiffs have a civil cause of action for defamation per se and malicious prosecution.

**D.**     **Amount in Controversy**

The amount in controversy is $207,847.94, not including punitive damages, and costs, which Plaintiffs are seeking because Defendants tortious conduct resulted in child endangerment, and irreparable harm to Plaintiff Stone's professional reputation.

### III.
### STATEMENT OF CLAIM

1. Plaintiff Stone is a U.S. citizen, born in Miami, Florida. He had not lived in the state of Florida for approximately thirty years, and resided in Chigasaki, Japan at the time the initial underlying matters occurred. Plaintiff Stone has resided in Japan since May of 2007.

2. Plaintiff Miyuki Suzuki (Suzuki) is a Japanese citizen. Suzuki never resided in the U.S., and at the time resided in Chigasaki, Japan.

3. M.S. is a U.S. citizen, and the minor child of Plaintiff Stone and Suzuki.

4. Ms. Germann is Plaintiff Stone's mother.

5. Germann is Ms. Germanns' husband from a second marriage.

6. Between November 2017 and March of 2018, Plaintiff Stone spent more than six hours in telephone conversation with the Germanns, planning work they wanted done on their Miami home, including renovation work to maximize profits and place it on the real estate market.

7. In February of 2018, the Germanns and Plaintiff Stone agreed Plaintiffs would travel to Miami and perform the work that needed to be done to satisfy the Germanns' goals.

8. The Germanns were to move permanently to Highlands County, where they had a second home, and remain at that home while the work was being performed. Plaintiffs were to stay at the Miami home while the work was being performed.

9. The Germanns were to reimburse Plaintiffs' travel costs, which was more than $3000.00.

10. The Germanns agreed to provide monetary and other benefits to Plaintiffs which included paying for Suzuki's nursing schooling, Plaintiff Stone's Hawaii bar exam costs, costs while located in Florida and replacement costs of personal property liquidated in Japan.

11. Relying on the Germanns' promises, Plaintiffs liquidated all personal property in Japan at pennies on the dollar, if that, including all furnishings, personal property, an automobile, and forfeiting rent deposit money on Plaintiffs' residence. *Exhibit A., are sample photographs of Plaintiffs' liquidated assets, amounting to losses greater than $30,000.00.*

12. The Germanns were to cover all costs of renovating their home.

13. Plaintiff Stone agreed to work on the Germanns' home from April to end of September 2018. The work included interior and exterior wall repair, painting, removal of debris, removing the Germanns' personal property to their home in Highlands County, and hiring plumbing, roofing, electrical, screening, locksmith and other contractors if needed to perform the required work.

14. Plaintiff Stone has the requisite skills to perform as he had previously been a building contractor in Florida, held a Florida real estates license, California brokers license, and has a juris doctorate. Plaintiff Stone's skills, licenses and education are relevant as damages that flowed from the Germanns' false representation, which Plaintiffs relied upon to their detriment resulted in the loss of their home in Japan, loss of employment, loss of business opportunities, continuing losses, damage to Plaintiff Stone's credit rating, damage to Plaintiff Stone's business reputation, loss of savings, loss of future earnings, loss of assets in Japan.

15. Prior to relying on the Germanns' misrepresentations, Plaintiff Stone had already interviewed for several positions at the Hawaii's AG's Office, and had been offered a position at the Hawaii Judiciary. The Germanns were aware Plaintiffs planned to reside in Hawaii after aiding the Germanns.

16. The Germanns knew beginning October 1st 2018, Plaintiff Stone was to begin studying for the Hawaii bar exam and take the exam in February of 2019.

17. March 8th 2018, Plaintiffs flew to Florida to begin performing as agreed. Proof of entry in the U.S. on March 8th 2018 is preserved on Suzuki's USCIS, I-94 Entry Status. *Exhibit B., is a true and correct copy of Suzuki's I-94 Entry Status.*

18. After Plaintiffs arrived in Miami, the Germanns refused to vacate the home and refused to reside at their Sebring home. This caused extensive delays and impeded Plaintiffs' ability to perform timely. The Germanns were argumentative at all times.

19. The Germanns did not reimburse Plaintiffs' travel expenses.

20. The Germanns did not cover Plaintiffs' expenses while in Florida, and did not reimburse money paid out-of-pocket, where Plaintiff paid Miami Electric Masters and Morgan Screening Company for repair work done on the Germanns' home.

21. From April to September of 2018 Stone substantially performed as agreed. *Exhibit C., are photographic examples of renovation work, which shows Plaintiffs substantially performed.*

22. The Germanns benefitted from the improvements to the home, including a substantial increase in market value. Plaintiff's Stone's work improved the market value of the home by approximately $50,000.00. This increase in is not speculative as the improvement value was discussed with Cyndee Kavula (Kavula), a licensed property appraiser, who owns her own real estate appraisal company, which she has operated for more than two decades. Kavula had also previously been a real estate broker in New Mexico and Nevada. Kavula is also the daughter of Ms. Germann, and sibling to Plaintiff Stone.

23. The Germanns refused to permit Stone to use the family vehicle. Even for purposes of aiding in work that needed to be done on the home, such as picking up supplies at Home Depot. As such, Plaintiffs were stranded without transportation. *See: Footnotes 1, 2 and 3.*

24. As a result of being stranded without transportation, Plaintiffs had to incur expenses that were not foreseeable, including paying $6000 cash on a deposit to lease/purchase option a Ford EcoSport, through Midway Ford dealership. Plaintiffs had to make monthly payments at a cost of $301.10 and had to pay $726.00 to Progressive Auto Insurance for insurance on the vehicle. *Exhibit D., are true and correct copies of invoices for the Ford EcoSport and Progressive Auto Insurance.*

Footnote 1: *Prior to Plaintiffs arrival in Florida, Ms. Germanns' Florida driver's license was suspended for not paying traffic tickets. The Germanns' automobile insurance policy was cancelled as a result of the unpaid tickets. Ms. Germann hid these facts from Germanns.*

Footnote 2: *Plaintiff Stone did not want Germann driving without auto insurance, and wanted to inform him of the matter. However, Ms. Germann refused to tell Germann for fear of domestic violence, as she had been the victim of repeat violence perpetrated by Germann in the past, resulting in black eyes, swollen face and facial bruising.*

Footnote 3: *The Germanns perjured themselves at a hearing in Miami-Dade County, falsely claiming Plaintiff Stone contacted Florida's DMV, and that contact resulted in driver license suspension, and subsequent tests for driver capacity. Factually, Ms. Germanns' driver's license and automobile insurance was cancelled BEFORE Plaintiffs arrived in Florida.*

25. By the end of July 2018, the Germanns were becoming grossly abusive and petty toward Suzuki. Shortly, thereafter, the abuse would turn violent.

26. August 9ᵗʰ 2018, at approximately 8:20AM, Stone was awoken by Ms. Germann shouting. The elderly woman was throwing a tantrum like a childish brat, and was being abusive toward Suzuki, who at that time was sitting at the dining table where she was home schooling M.S.

27. Ms. Germann was enraged about a bottle of cooking oil that Plaintiff Stone moved to the garage as it was excessively outdated. The oil was moved to the garage so the Germanns would not get sick from consuming it. As Ms. Germann continued to complain, Plaintiff Stone pointed out that he had moved the oil, that Suzuki had nothing to do with it, and, that there were numerous other bottles of oil that were not outdated which could use. Ms. Germann continued shouting, and being abusive, even ridiculing Plaintiffs for using the kitchen to store their own food.

28. Without provocation, Germann ran toward Plaintiff Stone, and violently attacked him, committing assault and numerous counts of battery, resulting in serious physical injuries, including a 3" gash over Stone's right eye, a gash on the right eyelid, and several cuts on the right arm. Plaintiff Stone also received a serious left elbow injury, which swelled to the size of a softball, and which took approximately one year to heal. *Exhibit E., are true and correct copies of photographs that show Plaintiff Stone's injuries, the result of Germanns' violent attack.*

29. Plaintiff Stone sought medical treatment from:

> Dr. Luis G. Geada
> 3821 S.W. 107 Ave.
> Miami, FL 33165
> Telephone: 305.226.0817

30. Dr. Geada diagnosed Plaintiff's Stone's elbow injury as a torn tendon, which would take up to one year to heal. Thereafter, Plaintiff Stone was unable to use his left arm for nearly one year.

31. Germanns' violent attack occurred within for feet of M.S., who was 4-years-old at the time and who witnessed the entire assault.

32. Germann shouted, "I'm going to get my gun and kill you."

33. M.S. was terrified by the violence.

34. Ms. Germann shouted, "Oh, why can't I keep my big mouth shut."

35. After Germann made death threats, he took overt acts to locate a gun he believed was located in his bedroom, which was approximately ten feet from where the assault occurred.

36.  Plaintiff Stone blocked Germann from entering the bedroom. Germann continued to assault Plaintiff Stone, trying to locate the gun.

37.  Plaintiff Stone shouted to Ms. Germann, to know if there really was a gun in the house. Ms. Germann responded, "I have his guns hidden." Plaintiff Stone responded, "Why do you have his guns hidden?"

38.  Plaintiff Stone has never owned a gun.

39.  Plaintiff Stone threatened to call 911 if Germann persisted in the attack.

40.  Only after Plaintiff Stone's threatened to call police did Germann cease in committing battery and stopped threatening to use a gun to commit murder. *See: Footnotes 4, 5 and 6.*

41.  After being assault, remaining at the Miami house was unbearable. However, Plaintiffs were running out of money, as the Germanns had not kept up the end of their agreement, failed to reimburse travel costs, and did not cover any of Plaintiff's expenses while in Miami. The Germanns even refused to reimburse out-of--pocket expenses Plaintiffs paid for, which benefitted no one but the Germanns.

42.  The Germanns abuses escalated, including locking Plaintiffs out of the Miami home, and engaging in other provocations and petty one-sided arguments.

43.  As the September deadline to finalize the improvements approached, Stone asked the Germanns to go to Sebring so the work could be finished without further delays. Instead, the Germanns tortuously interfered with Plaintiff Stone's work performance by engaging into a scheme with Michael Stone, Teresa Georgilakis, and Angelo Georgilakis to have Plaintiff's removed from the Miami home, without providing any compensation whatsoever regarding the significant amount of work Plaintiffs performed.

*Footnote 4: Ms. Germann has hidden guns from Germann in the past, due repeat domestic violence, and for uttering threats to use guns to commit violence and murder. Police have also gone to the home and removed guns due domestic battery and repeat violence.*

*Footnote 5: Germann has battered other family members, usually female family members. Injuries include broken noses, broken ribs, broken teeth, kicks, punches and pulling hair.*

*Footnote 6: Germann's victims include Ms. Germann, Defendant Georgilakis, and Georgilakis' son Brett McCullough.*

### Defendant Germanns' Home Renovations and Unjust Enrichment

44. After Plaintiffs arrived in Miami, Plaintiff Stone inspected the Germanns' home.

45. The property was in a state of waste.

46. Home repairs had not been performed in many years, and what had been done was performed by unlicensed and unskilled day laborers. Moreover, the home remained unrepaired since damaged by Hurricane Irma (Irma) in 2017.

47. The dock on the lake behind the home was destroyed, unattached to moorings, and had drifted, and collided against a property boundary wall. Half the dock was underwater.

48. All porch screens had been torn away by Irma and remained in that state. There was damage to aluminum framing to the porch, sections were torn away, and a damaged ceiling fan had exposed live electrical wiring dangling from it.

49. Paint peeled off of badly deteriorating exterior walls the house. Everything was covered in mold. Fascia was rotted and termite infested.

50. The roof leaked and needed to be replaced.

51. The plumbing was in such bad condition, Plaintiffs had to shower in the yard using a hose.

52. Toilets flooded, and the kitchen sink was clogged.

53. Plaintiff Stone paid out-of-pocket $450.00 to Morgan Screening Company to replace the damaged screens and repair the damage to the porch. The Germanns did not reimburse these costs. *Exhibit F., is a true and correct copy of the Morgan Screening Company work performed.*

54. An electrical fire broke out in an outlet in an added on "family room" due to faulty wiring. Plaintiff Stone paid Miami Electric Masters, $231.47 to repair the faulty electrical wiring. The Germanns did not reimburse these costs. *Exhibit G., is a true and correct copy of the receipt for payment on the faulty electrical wiring repair done by Miami Electric Masters.*

55. Faulty electrical wiring in the Germanns bedroom resulted in an explosion that occurred inside the west facing wall. Half of the electrical in the bedroom shorted out as a result. The TV in the room was destroyed by the explosion. Stone obtained an estimate from Miami Electric Masters to repair the remaining electrical issues at the home, but the Germanns refused to pay.

56. The Germanns are hoarders, and their bedroom and other rooms in the home were impassible, and filled to the ceiling with obsolete products.

57. The Germanns' bedroom was covered in a thick layer of dust. The bedroom was infested with dust mites. The virus, Molluscum Contagiosum infected M.S. The infection took nearly one

year to heal, and caused the child great suffering as the disease had to be burnt off of the child's body in several locations. *Exhibit H., are true and correct copies of photographs that show the damage suffered by the child due the infection.*

58. The garage was impassible as well. The garage door had an interior handle, which didn't have a lock on it. The garage door could not be opened, and was blocked by a mountain of debris.

59. The Germanns refused to permit the items to be cleared away, even though that was part of the work that needed to be performed.

60. The garage was covered in vermin excrement, including that of cockroaches, mice and rats. *Exhibit I., are photographs that show the poor condition of the Germanns' home interior and vermin infestation.*

61. The Germanns' exterior security lights did not work. The home was a prime target for home invasion, and Plaintiff Stone had reasonable concerns as the Germanns home had been broken into several times in the past.

62. Exterior doors lacked adequate, and properly functioning handles and locks. To secure the family room sliding glass doors, the Germanns used a stick.

63. Twice, the Miami-Dade Police Department were called to the home due transients using the porch to sleep and the backyard to bath. The police were involved in one incident where a naked man was within a few feet of a window in the bedroom M.S. was sleeping. *Exhibit J. is a true and correct copy of the MDPD Police Report, Number PD180624231363, which pertains to the naked man incident.*

64. Plaintiff Stone had Dade Lock and Key provide a reasonable fee to replace and repair all exterior locks, including sliding glass door which did not function properly. The Germanns refused to pay to upgrade the locks. *Exhibit K., is a true and correct copy of the Dade Lock and Key Company estimate to repair and replace the faulty door locks.*

65. Stone has four siblings who reside in the state of Florida, including Michael Stone, Sherry Stone and Teresa Georgilakis. None lived within 170 miles of Miami and none came to aid Plaintiff Stone get the work done.

66. The Germanns were heavily overmedicated, and consuming food from cans, bottles and cartons that were seriously outdated. The containers of the outdated food were covered in cockroach excrement, and cockroaches and other vermin were eating the labels off of the cans.

67. Many labels showed expiration dates as far back as 2002. *Exhibit L., are true and correct copies of "food" the Germanns were consuming, and which was the subject of the August 2018 assault discussed herein.*

68. Concerned for the health and safety of the Germanns, Plaintiff Stone contacted the Miami-Dade Health Department which looked over the same photographs presented in Exhibit L., and concluded the Germanns were living in squalor, and conditions of self-abuse and self-neglect.

69. The Miami-Dade Fire Department concluded the home was a fire hazard and did not meet minimum building codes.

70. Plaintiff Stone provided his concerns to his siblings, but none came to aid in the matter. Instead, Michael Stone, and Georgilakis began communicating to the Germanns that the Plaintiffs had gone to Miami to "steal their home." Michael Stone and Georgilakis' false communications continued on a daily basis, even where Stone and the Georgilakis had not gone to Miami to visit, were not aware of the inspection reports, were not communicating with the Plaintiffs and were entirely aware Plaintiffs were trying to get the work done by end of September so they could go to Hawaii.

71. Plaintiff Stone's siblings, Teresa Georgilakis and Sherry Stone are convicted felons.

72. Georgilakis spent time in prison for bank and credit card fraud and identity theft. Georgilakis was on probation for petty theft at the time Plaintiffs were at the Miami home, and making defamatory and untrue statements about the Plaintiffs to the Germanns. Moreover, at that time, Georgilakis was also under investigation by Polk County prosecutors for theft of $1600.00 in jewelry from Kays Jewelers.

73. Sherry Stone has two felony theft convictions in Highlands County.

74. October 2nd 2018, the Germanns finally went to their home in Sebring. By that time the period to perform had elapsed and Plaintiffs' damages were piling up. The Germanns were in breach, Plaintiffs had substantially performed, but reaped no benefit whatsoever.

75. October 3rd 2018, the Germanns were in Sebring. Plaintiffs had gone to Coconut Grove and spent the day at a Children's Park, where the family played and had a picnic. While at the park, Michael Stone, who was in Sebring, and with the Germanns at their Sebring residence, made several 911 phone calls, falsely claiming there was a "fight" at the Miami home over money.

76. Michael Stone made the 911 calls fully aware there was no fight, there was no emergency situation, and, that the Germanns were in Sebring at the time the calls were made, 170 miles north of Miami-Dade County.

77. Miami-Dade Police Department (MDPD), Officer Michael Bennett (Bennett) responded to the "emergency calls." Bennett arrived at around 7:55PM. Plaintiffs arrived a few minutes later. *See: MDPD Kendal Division, Police Report No. PD181004363192.*

78. Bennett told Plaintiff Stone he was called out to the house because MDPD had received 911 phone calls from Michael Stone, who had reported there was a fight at the home over money.

79. Plaintiff Stone gave Bennett Michael Stone's telephone number. Bennett attempted to initiate contact with Michael Stone, but he did not answer the calls.

80. Plaintiff Stone gave Bennett the telephone number of Sherry Stone who also resides in Highlands County. Sherry Stone told Bennett the Germanns were in Sebring since the previous day, October 2nd 2018, and, that Ms. Germann had gone to a dermatologist appointment that very day, in Sebring.

81. Plaintiff Stone permitted Bennett to enter the home.

82. Bennett noted the poor condition of the home, that rooms were not passable. He noted the conditions of squalor, and the seriously outdated food and vermin.

83. Plaintiff Stone told Bennett his family resided in Japan and had gone to Miami to aid the Germanns renovate the home and put it on the real estate market.

84. Plaintiff Stone told Bennett that his siblings were not aiding in the matter and were creating hostile conditions. Plaintiff Stone told Bennett the Germanns were both 82-years-old and heavily overmedicated.

85. Bennett told Plaintiff Stone he had recently gone through a similar hostile situation with his sister regarding the care of his mother, and that the matter was resolved through guardianship. Bennett stated the mother was in much better situation after the guardianship was set up. Bennett provided Plaintiff Stone the contact information of Luneen Skelton, the Supervisor of the Miami-Dade Mental Health Department.

86. Officer Bennett suggested the Germanns should be medically evaluated for a determination if guardianship was required.

87. The following day, October 4th 2018, Plaintiff Stone scheduled an appointment with Luneen Skelton for October 9th 2018. The appointment was set for 1:00PM. The purpose of the

appointment was to learn about guardianship matters, and to see if one was needed for the Germanns.

88. Thereafter, Plaintiff Stone sent an email to siblings Sherry Stone and Kavula seeking their input if guardianship was required.

89. Plaintiff Stone asked Sherry Stone to be the guardian, and asked if she was willing to take the required classes to be guardian. She said she was.

90. Plaintiff made it clear that he was not interested in overseeing the guardianship matter as his family was not going to remain in Florida but reside, go to Hawaii.

91. However, Plaintiff Stone did not know it, but at that time, Georgilakis was accessing Sherry Stone's email account, using the password she had stolen and reading the emails, which were not intended for her. This included emails between Plaintiff Stone, Suzuki, and other family members.

92. Georgilakis violated Florida's Computer Crimes Law, Fl. St. § 815.01, accessing, reading and copying those emails, and providing the content therein to the Germanns.

93. Between October 2nd 2018 and October 5th 2018, the Germanns remained in Sebring. However, on October 5th 2018, the Germanns, and Georgilakis, arrived at the Miami home around noon. They remained at the home less than 30 minutes.

94. Germann and Georgilakis began shouting at Suzuki, calling her a Jap, and telling her to go back to Japan. Plaintiff Stone made a non-emergency telephone call to MDPD and recorded the abusive language and threats from the public sidewalk located in front of the Germanns' Miami home.

95. Officers A.J. Perea and Nicolas Sans, responded to Stone's call.

96. Perea, filed a police report, No. PD181005364100. The "reporting" persons were Ms. Germann and Plaintiff Stone.

97. Ms. Germann reported she wanted Plaintiff's family to leave. Ms. Germann did not make any claim about being a victim of violence perpetrated by Stone, nor did she claim she feared Plaintiff Stone. Ms. Germann merely stated Plaintiff Stone had "moved things" and was "throwing things out." Perea, "referenced" eviction. *Exhibit M., is a true and correct copy of MDPD Officer Perea's police report.*

98. The Germanns and Georgilakis left shortly thereafter and Officers Perea and Sans remained present until they left.

99. The Germanns and Georgilakis returned to Sebring.

100. Plaintiff Stone has not seen, nor communicated with the Germanns or Georgilakis since that date.

101. Later that same evening, October 5th 2018, Michael Stone sent a threatening email to Plaintiff Stone. The threatening email included Michael Stone would "shoot and kill" Plaintiff Stone, "on sight." Outside of threatening emails, Michael Stone had not contact with Plaintiff Stone whatsoever during the entire time the Plaintiffs were in Miami.

102. Michael Stone's threatened he learned "a shit ton of bad things from bad cops", and threatened to file a "multi-party" restraining order that included children, if Plaintiff Stone and his family did not leave the Miami home within 24 hours. Michael Stone held no ownership rights in the Miami home to make such demands.

103. Michael Stone went on to threaten, "it's really fucking hard to find work... With an injunction for protection... not just any old injunction but one with many children...Not a great resume builder, huh?"

104. Michael Stone's threatening email included the following:

From: Michael Stone
Date: Fri, Oct 5, 2018 9:10 PM
Subject:Re: Songs to my friends if so inspired to here.

What now bitch? What now bitch?
Get out, leave. I have two more legal cards to play. You have 24 hours to do so. Your move.
You will not like mine.
The injunction and trespass, let me make this VERY FUCKING CLEAR TO YOU BOY, are not my next move.
... I learned a shit ton of bad things from bad cops.
... Its' good to be in a small town where you campaign for the Republican Sheriff...
This is not an idle threat.
You will be shot on sight.
On sight. I got second place in Academy.
"... Just to let you know, it's really fucking hard to find work... With an injunction for protection... not just any old injunction but one with many children...Not a great resume builder, huh?"

105. *Exhibit N., is a true and correct copy of Michael Scott Stone's threatening email.*

106. Plaintiff Stone did not respond to Michael Stone's threatening email directly, but instead, forwarded the email to Michael Stone's employer. The email was forwarded to Michael Stone's

employer because other threatening email communications Michael Stone sent to Plaintiffs would have resulted in liability to the employer if Michael Stone made good on his threats.

107. The following morning, October 6th 2018, Michael Stone was terminated by his employer for sending the October 5th 2018 threatening email.

108. Immediately following termination, Michael Stone engaged in a months long retaliation campaign of terror. Michael Stone attempted, and failed several times to obtain multi-party restraining orders in Highland County, even where that court had no personal jurisdiction over Plaintiff Stone.

109. Michael Stone's multi-party injunction included adults who were not aware the injunction had been filed on their behalf. Michal Stone violated Sperry v. Florida Bar Association, 373 U.S. 379 (1963), acting as an unlicensed attorney representing several parties to the sham injunctions.

110. Highlands County Court dismissed every one of Michael Stone's injunction attempts. Even so, he kept refiling. *Exhibit O., is a true and correct copy of the January 16th 2019, Highlands County Court Order dismissing Michael Stone's injunction, filed more than four months after Plaintiff' had already returned to Japan.*

111. Michael Stone's sham injunctions and dismissals amounts to malicious prosecution, fraud on the court and abuse of process.

112. November 5th 2018, Michael Stone contacted the U.S. Tokyo Embassy and made false and defamatory statements to consulate staff, resulting in the consulates creating a report on the matter. *Exhibit P., is a true and correct copy of the U.S. Tokyo Embassy consulate's report.*

### Misappropriation of Plaintiff's Personal and Business Property

113. Early morning, on October 9th 2018, Plaintiffs heard a loud bang at the front door of the Miami home. It sounded like an explosion. Plaintiff Stone looked out the window and saw Michael Stone running down the street. Plaintiff Stone contacted the MDPD and filed a report, No. PD181009368930. *Exhibit Q., is a true and correct copy of MDPD Report No. PD181009368930.*

*114.* That same morning, October 9th 2018, the Georgilakis drove the Germanns to the Miami-Dade Family Court, and aided the Germanns in filing perjured petition statements. The perjured petitions claimed Plaintiff Stone punched Germann on a date Germann was located in Sebring, and, that Plaintiff Stone had killed a family pet. The petitions were signed under sworn oath and under

penalty of perjury, and contempt proceedings. Petitioners would later blame Spanish speaking staff at the court for their perjured statements. *See: Footnote 7.*

115. Relying on the perjured petition statements, Judge Michaelle Gonzalez-Paulson issued a temporary restraining order (TRO), with a hearing set on the matter for October 15th 2018.

116. At approximately noon on the same day, October 9th 2018, Plaintiff Stone was exiting the Miami home to go to the 1:00PM appointment with Luneen Skelton. MDPD officers arrived at the home and hand delivered the TRO to Plaintiff Stone. Plaintiffs were ordered to leave the Miami home immediately and were not permitted time to remove their personal property.

117. Plaintiffs drove to Sebring where sibling Sherry Stone resides.

118. Later that same day, on October 9th 2018, USP delivered a valuable musical instrument that was shipped from Japan to the Miami home. The instrument was the personal property of Plaintiff Stone and had cost $2040.00. Georgilakis signed for, and and took possession of a musical instrument. Georgilakis did not forwarded the instrument on to Plaintiff Stone, violating 18 U.S. Code § 1708 and 18 U.S. Code § 1703, which are federal statutes that apply to theft of mail, obstruction of mail, and delay or destruction of mail. The Germanns took possession of other mail which was not forwarded on. Georgilakis notified Plaintiff Stone she had taken possession of the instrument. More than two years passed and the instrument was not returned to Plaintiff Stone.

119. Plaintiffs property that was left at the Miami home was pilfered through by the Georgilakis, and Michael Stone. They took whatever they wanted.

120. Plaintiff Stone stayed at Sherry Stone's home one night.

121. October 10th 2018, Plaintiff Stone returned to Japan because his spouse visa was set to expire and had to be renewed in-person, at Japan's Immigration Bureau, with an October 12th 2018 deadline.

122. Suzuki and M.S. remained at Sherry Stone's home until November 11th 2018 because Plaintiffs had no home to return to in Japan and he had to return to Japan to set up replacement housing.

*Footnote 7: July 2nd 2020, the Germanns admitted at a hearing before Miami-Dade Court, Judge Michaelle Gonzalez-Paulson their petition statements were perjured, that they didn't have a pet and that Plaintiff Stone did not kill a family pet.*

123. Prior to returning to Japan, October 10th 2018, Plaintiff Stone notified the Miami-Dade County court he could not appear October 15th 2018, and motioned for the court to reschedule hearing. The motion was granted. The Miami-Dade County court notified Plaintiff Stone would receive EService Notice of the new hearing date. The court never communicated with Plaintiff Stone ever again.

124. November 8th 2018, the Germanns and Georgilakis discovered Suzuki and M.S. were staying at Sherry Stone's home, drove to the home and confronted Suzuki.

125. The Germanns and Georgilakis threatened to not return Plaintiffs' property if suit was brought over the matter.

126. November 11th 2018, in fear of the Germanns, Georgilakis and Michael Stone, Suzuki returned to Japan with M.S. Prior to returning to Japan, Suzuki prepared property to be shipped, because she could not carry it onto a plane, as she had M.S. to care for, a stroller, and carry on luggage. As well, the flight was 24 hours. Sherry Stone agreed to care for the property and to ship it to Japan. The property was never returned, and Sherry Stone converted it to her own use.

*127.* The property Sherry Stone converted to her own use includes two OWC 8T hard drives, professional photography equipment, used as work tools, important documents, a Porter Bag and other items. The replacement costs for these items exceeds $11,000.00. *Exhibit R., are true and correct copies of receipts for the purchase of the OWC drives and the photography equipment.*

128. The loss of business use of the property exceeds $8,000.00. Further, December 2020, Plaintiff Stone entered into a contract with Banix Corporation, to fund a documentary film. $7000.00 was advanced on the film production, but the camera equipment misappropriated (stolen) by Sherry Stone is required for the production. The tortious conduct of Sherry Stone results in Plaintiff Stone's inability to begin production, and could lead to suit by Banix Corporation for breach of contract.

129. A hearing was held November 15th 20918, at the Miami-Dade family court. Plaintiff Stone was not provided notice, or an opportunity to be heard. Defendants Germann appeared and presented perjured statement, they admitted July 2nd 2020 to be perjured statements.

130. Gonzalez-Paulson issued permanent injunctions, which irreparably harmed Plaintiff Stone's professional reputation. The injunction was never served on Plaintiff Stone. The only valid manner in which an injunction can be served in Miami-Dade County is by the Miami-Dade Sheriffs.

As service was never provided, the injunctions remains unserved and invalid. To date, Plaintiff Stone has never been served the injunctions.

131. Plaintiff Stone motioned for a Fl. St. 1.540 motion to vacate the injunction due perjured statement, fraud on the court, malicious prosecution, abuse of process, improper venue, lack of personal jurisdiction, and where the court held the initial hearing without notice. Plaintiff Stone also motioned for the court to compel the return of the property the Germanns had refused to return.

132. A hearing was scheduled July 2nd 2020, and Gonzalez-Paulson presided over the matter. The hearing was held via Zoom, and the audio and video of the hearing was preserved as part of the record. At the hearing, **the Germanns admitted to petition perjury.** Gonzalez-Paulson Ordered the Germanns to return Plaintiff's property. This would be the second order issued by the Miami-Dade court regarding said property.

133. August 3rd 2020, Gonzalez-Paulson issued a third order for the Germanns to return Plaintiff's property by specific date. The Germanns did not return the property by the date set by the court.

134. The Germanns still retain possession of Plaintiffs property and are in wrongful possession.

135. Plaintiff Stone paid Sherry Stone $470.00 USD to return the property Suzuki left at Sherry Stone's home. Sherry Stone never returned the property.

136. September 21st 2020, Plaintiff Stone brought a Replevin Action against Sherry Stone in Highlands County Court. Judge Ritenour Ordered Sherry Stone to Show Cause why she had not returned said property, especially where Plaintiff paid for the property to be shipped.

137. October 8th 2020, Judge Ritenour Ordered the return of Plaintiffs' property. Sherry Stone did not comply with Judge Ritenaur's Order, but instead, sent Plaintiff Stone threatening emails stating she would destroy the property.

138. Plaintiff Stone motioned for a Status Report Hearing.

139. November 9th 2020, Judge Ritenour gave Sherry Stone FIVE DAYS to return said property, but she did not. Instead, Sherry Stone committed fraud on the court, shipped valueless junk, instead of the property that was the subject of the Highland's County Court's Order.

140. Plaintiff Stone attempted to contact Sherry Stone, but she blocked phone calls.

141. Plaintiff Stone motioned for a Status Report Hearing, but Sherry Stone blocked notices through the Florida Court's Eservice, and blocked receiving notices from Plaintiff Stone and the Highlands Court as well.

142. Due Gonzalez-Paulson holding the initial hearing without notice, and issuing injunctions without opportunity to be heard, and where the Germanns admitted to petition perjury, and where that court was an improper venue and lacked personal jurisdiction over Plaintiff Stone, a judicial qualifications commission complaint was filed, resulting in Gonzalez-Paulson recusing herself from the matter.

### Other Relevant Tort Matters

143. The Germanns, the Georgilakis, Michael Stone, Sherry Stone and her common law husband, Daris Edward Harried, pilfered through Plaintiff's property, misappropriated what they wanted and discarded the rest. Defendants disregarded court orders in doing so, and consequential damages flow to the Plaintiffs.

144. Plaintiffs returned to Japan without a home to go to, and no personal property, including no furnishings, or clothing. Plaintiffs were stranded without automobile, and suffered other damages, including child endangerment as Plaintiffs had no advanced notice, or opportunity to locate a safe place for M.S. to be taken, after the Germanns and Georgilakis committed fraud, perjury and other misconduct to eject the Plaintiffs from the Miami home.

145. The filing of perjured petitions, rife with misconduct and fraud on the court, endangered the health, safety and welfare of M.S., merely 4-years-old at the time the child was thrown out onto the streets with no place to go.

146. Plaintiff Stone had to return the Ford EcoSport to the Ford Motor Company, causing damage to his credit rating. Plaintiff lost $7930.40 on the Ford EcoSport, and only had 10 weeks use of the vehicle.

147. Due to breach of agreement, and Plaintiff's detrimental reliance on the Germanns' false representations, Plaintiff Stone was unable to cover the costs to travel to Hawaii to obtain work at the Hawaii Judiciary, or to study for, or take the Hawaii bar exam.

148. Plaintiffs remain stranded in Japan as a result.

149. In March of 2019, the Germanns sold their Miami home for $430,000.00. The original purchase price was $42,000.00. The home was in terrible condition prior to Plaintiffs improvement. Plaintiffs substantial performed, and relied upon the Germanns false and misleading representation, all while the Germanns benefitted from the improvements.

150. The Germanns must not be permitted to financially benefit from Plaintiff's hard work.

151. The Germanns' were unjustly enriched by work Plaintiffs performed on the Miami home.

152. In August of 2020, the Germanns, through Trembly Law Firm, offered to vacate injunction through joint motion, not through remorse, or, based on the truth of the matter, but instead, because the Germanns don't want to pay any further legal fees. Plaintiffs rejected the offer.

153. Plaintiff Stone entered into a contract with a producer to begin producing a documentary film about international child abductions. The equipment Defendants have stolen is required for the production to move forward. Without the property, the film cannot be made.

154. Plaintiff Stone received an advance of $7000.00 on the film production and now that Defendants have failed to return the property and converted it to their own use, this could result in the producer who advanced the funds filing suit against Plaintiff Stone.

155. Plaintiffs have suffered extensive and ongoing damages, including extensive and ongoing financial harm, and Defendants are collectively, and proximately responsible for the damages.

156. Plaintiffs demand $207,847.94 in damages.

## IV.
## RELIEF

Plaintiffs seeks general, actual, compensatory, and restitution damages as a result of detrimental reliance on Defendant Germanns' false and misleading representations, and to be compensated for all subsequent harms that followed.

Plaintiffs demand to be put back in the financial position they were in prior to relying on Defendant Germanns' false representations in the amount of $33,458.18.

Plaintiffs demands $19,777.89, to replace the OWC hard drives, photography equipment and important documents Defendant Sherry Stone either destroyed, or converted to her own use, property that was to be returned to Plaintiffs under two Highlands County Court Orders, but was not returned.

Plaintiffs demands to be reimbursed airfare costs and monies paid to lease/purchase a Ford EcoSport, and automobile insurance, totaling $13,930.40, losses Plaintiffs would not have incurred had the Germanns not misled the Plaintiffs and had carried out the terms of agreement.

Plaintiff demands reimbursement of $231.47 for paying Miami Electric Masters to perform repairs on Defendant Germanns' Miami home, repairs only the Germanns benefitted from.

Plaintiff demands reimbursement of $450.00 paid to Morgan Screening Company, for repairs done on Defendant Germanns' Miami home, repairs only the Germanns benefitted from.

Plaintiff Stone demands compensatory damages for pain and suffering and physical injuries caused by Defendant Peter Edward Germann who assaulted and battered Plaintiff Stone without provocation, in the amount of $30,000.00.

Plaintiffs demands compensatory damages whereby Defendant Peter Edward Germann committed violence, and threatened to commit murder with a gun in close proximity to M.S., in the amount of $30,000.00.

Plaintiffs demands conversion, and non-use of misappropriated property, the Germanns refused to return to Plaintiffs, including personal and business use losses in the amount of $30,000.00.

Plaintiffs demands compensatory damages for unjust enrichment due tortious interference and breach of contract, implied contract and quantum meruit, in the amount of $50,000.00, as Plaintiffs substantially performed to the terms Defendants Germanns agreed to, which Defendant Germanns alone benefitted from, and but for breach, and gross delays, every aspect of what was required would have been performed by Plaintiffs.

Plaintiffs also demand compensatory damages for damage to Plaintiff Stone's credit rating and damages to Plaintiff Stone's professional reputation in the amount of $30,000.00.

Plaintiffs seek a total of $207,847.94 in damages, not including costs related to filing this suit, legal fees, court costs, or other expenses incurred.

Finally, Plaintiffs seeks unspecified punitive damages due Defendants reprehensible and morally egregious tortious acts that resulted in irreparable harm to M.S., and for damages to Plaintiff Stone's professional reputation and for engaging in a scheme that amounted to defamation per se, falsely claiming Plaintiff Stone punched Peter Edward Germann and falsely claiming Plaintiff Stone killed a family pet, where the Germanns did not own a pet and admitted to this fact before Judge Michaelle Gonzalez-Paulson at a July 2nd 2020 hearing, held at the Miami-Dade County Court.

## V.
## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have

evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted,

December 25th 2020

Jack Stone
Maison Sato #101
2-2-15 Tsunogoro
Aoba, Sendai, Japan 980-0874
Telephone: 81 070.6951.2337
Email: stack.jones@mail.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on December 25th 2020, via email, or regular mail on all parties of record on the Service List below.

Peter Edward Germann
1002 Dewitt Street
Sebring, FL 33872

Elizabeth Helen Germann
1002 Dewitt Street
Sebring, FL 33872

Teresa Georgilakis
14250 Nieves Circle
Winter Garden, FL 34787
Telephone: 407.209.6890
Email: teri5g@hotmail.com

Angelo Georgilakis
14250 Nieves Circle
Winter Garden, FL 34787
Telephone: 407.209.6890
Email: teri5g@hotmail.com

Michael Scott Stone
4456 Madeira Avenue
Sebring, FL 33872
Telephone: 863.471.2147
Email: captjacks@hotmail.com